## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

MYCHOICE, LLC, and
BARBOARDS, LLC

               Plaintiffs,

       v.

TAIV, INC.,

               Defendant.

**C.A. No. 2:25-cv-1067**

**JURY TRIAL DEMANDED**

### PLAINTIFFS' ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs MyChoice, LLC ("MyChoice") and BarBoards, LLC ("BarBoards") (collectively, "Plaintiffs") for their Original Complaint for patent infringement against Defendant Taiv, Inc. ("Taiv"), hereby state and allege as follows:

### RELATEDNESS TO OTHER CASES

1.      This action is related to the action styled *MyChoice, LLC et al. v. Taiv, Inc.*, Case No. 2:23-cv-00507-JRG-RSP (the "507 Case"), pending in the District Court for the Eastern District of Texas, Marshall Division.  In both the instant case and the 507 Case, Plaintiffs are asserting the same patent, U.S. Patent No. 10,708,658, against the same defendant, Taiv.

### NATURE OF THE ACTION

2.      This is an action for patent infringement.  MyChoice is the owner of U.S. Patent No. 10,708,658 (the "'658 Patent") entitled "Video Viewing Experience Enhanced Through Custom Curation," which duly issued on July 7, 2020, to inventor Richard Theriault.  A true and correct copy of the '658 Patent is attached to this Complaint as **Exhibit A**.  As explained below, Taiv has made, used, offered for sale, sold, and/or imported in the United States products and

services that infringe the '658 Patent, and it has induced and contributed to its customers' infringement of the '658 Patent.

## THE PARTIES

3.     MyChoice is a limited liability company organized and existing under the laws of the Commonwealth of Massachusetts and has a principal place of business at 17836 Ogallala Warpath Rd, Los Gatos, CA 95033.  Its Managing Member is Mr. Richard Theriault.

4.     BarBoards is a limited liability company organized and existing under the laws of the state of Texas and has a principal place of business at 111 W Anderson Lane E300, Austin, TX 78752. BarBoards' Managing Member is Mr. Daniel Limcher.  Pursuant to an agreement executed between MyChoice and BarBoards, BarBoards is the exclusive licensee to the '658 Patent and has an interest in enforcement of the '658 Patent.

5.     Taiv is a corporation organized and existing under the laws of the Province of Manitoba, Canada and has a principal place of business at 195 McPhillips Street, Winnipeg, Province of Manitoba, Canada.  Upon information and belief, Taiv does business in Texas and in this Judicial District, directly or through intermediaries.

6.     A substantial part of the events giving rise to Plaintiffs' cause of action as alleged herein occurred in the Eastern District of Texas and have a direct effect on Plaintiffs in the Eastern District of Texas.

## JURISDICTION AND VENUE

7.     By making the following allegations, Plaintiffs not only allege that the Court may exercise jurisdiction over this dispute and that venue is proper in this District—the following paragraphs also constitute allegations and theories of liability for patent infringement against Taiv.

8.      This Court has subject matter jurisdiction pursuant to 35 U.S.C. §§ 1331 and 1338(a), as this action arises under the Acts of Congress relating to patents, namely, 35 U.S.C. §§ 271, 281-285.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the action is between a citizen of the United States and an alien, and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

9.      As discussed in greater detail below, Taiv has committed acts of patent infringement and/or has induced and/or contributed to acts of patent infringement by others in this judicial district, the State of Texas, and elsewhere in the United States, and continues to do so willfully and without authorization by making, using offering for sale, selling, or importing various products or services that infringe U.S. Patent No. 10,708,658.

10.     This Court has personal jurisdiction over Taiv consistent with the requirements of the Due Process Clause of the United States Constitution and the laws of this State, including, but not limited to, the Long-Arm Statute of the State of Texas, Tex. Civ. Prac. & Rem. Code § 17.042. On information and belief, Taiv has, directly or through subsidiaries or intermediaries, committed acts of patent infringement in this State and in this Judicial District as alleged in this Complaint. Moreover, on information and belief, Taiv has purposefully and voluntarily placed its products into the stream of commerce with the expectation that they will be purchased and used by customers located in this State.   On information and belief, Taiv has committed acts of infringement in this State and this Judicial District.

11.     As explained in more detail below, Taiv's business consists of marketing and selling hardware/software systems that allow Taiv's venue-employee partners ("Taiv Partners") to replace undesirable content on the Taiv Partners' television screens for desirable content supplied in part from Taiv's network of advertisers.  Taiv has employed and/or contracted with individuals

3

in Texas to install, service, and maintain its systems throughout the state of Texas, including in this District, and likewise contracted with Taiv Partners in Texas regarding their use of the hardware, software, and services provided in connection with such systems.

12.     At least as early as 2022, Taiv began promoting and offering its content replacement systems to bars, restaurants, and other venues in Texas.  Taiv's sales team went door-to-door to sports bars and restaurants seeking to interest them in Taiv's offering.  On information and belief, Taiv has entered into contracts with the owners or managers of at least 67 venues in Texas.  By way of example, those contracts provide that Taiv would install and maintain its hardware/software at their venue in Texas and then pay them at their location in Texas.  Again, these contracts called for Taiv's performance at the location of the venue in Texas; performance could not as a practical matter take place at any other location.  Taiv maintained ownership of all the hardware, software, and all intellectual property rights included in its content replacement systems installed at Taiv Partner locations in Texas.  Taiv also agreed to provide free customer support including "on-site service" for any issues related to its hardware or software that it installed at Taiv Partner locations in Texas.

13.     Taiv is now operating out of more than 2,000 venues throughout the United States, with many of those venues in Texas, including Austin, Dallas, and Houston.  Taiv's contracts with its customers in Texas provide that the contracts will "stay in effect until terminated."  Such contracts are sometimes known as "evergreen" contracts; they are perpetual unless affirmatively terminated.  By such contracts, Taiv seeks to and does establish long-term business relationships with its venue customers located in Texas.  At each of the locations in Texas where Taiv owns and operates its content replacement systems, Taiv directly infringes the '658 Patent, and induces and

contributes to the infringement of that patent by Taiv Partners.  Thus, Taiv is systematically and continuously committing torts in the State of Texas, including in this District.

14.    In addition, Taiv's current web site is highly interactive, exists on the world wide web, and is available in the State of Texas at the web address of https://www.taiv.tv.  On its website, Taiv also markets its services and provides that potential Taiv Partners may contact it directly to make inquiries:



*See* https://www.taiv.tv/#Get-Started.  Based on Taiv's web site, once a potential Taiv Partner in Texas contacts Taiv's headquarters in Canada, one or more of Taiv's salespeople and/or executives then arranges to contact that potential customer in Texas.  On information and belief, if such contact results in an agreement: (1) the new Taiv Partner located in Texas signs its contract with Taiv in Texas; (2) Taiv agrees to and does perform all the installation of its hardware/software equipment at the Taiv Partner's location in Texas; (3) Taiv arranges to perform all on-site service at the Taiv Partner's location in Texas; and (4) Taiv pays that Taiv Partner at its location in Texas.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c)(3) as acts of infringement occurred in this District and Taiv is not a resident of the United States and therefore venue is proper in any judicial district of the United States.  Section 1400(b) of Title 28 does not govern venue determination as to foreign defendants in a patent infringement action. *Brunette v. Mach. Works, Ltd. v. Kockum Indus., Inc*. 406 U.S. 706 (1972).

## FACTUAL BACKGROUND

**A.    The Beginning of the Content Avoidance, Replacement, and Curation Industry, MyChoice, and the '658 Patent**

16.     For over a decade, MyChoice has pioneered the content detection, avoidance, replacement, and curation industry.  As part of its mission to return control to television viewers, MyChoice's first product, the "Puck," was a commercial avoidance product designed to enable consumers to avoid exposure to commercials wholesale, particularly because of the prevalence of unwanted material in advertising, including sex, violence, objectification of women, and excessive materialism.  The Puck's functionality was simple, but effective.  In short, a human operator would detect advertisements from a remote location and transmit a signal to the consumer's Puck, which would then change the television channel.  Early on, MyChoice protected its inventive ideas by filing for patent protection, including U.S. Patent Application No. 13/898,578, which issued as U.S. Patent No. 9,021,518 (the "'518 Patent") on April 28, 2025.  While the '518 Patent is not asserted in this Action, the '518 Patent's disclosure describes MyChoice's early understanding of commercial avoidance technology, including technology that was incorporated in MyChoice's products and services.

17.     Over the following years, MyChoice continued to develop commercial avoidance products, including a software-only in-home product without the Puck hardware.  And as MyChoice grew and developed, MyChoice's focus evolved from mere commercial avoidance to

content replacement.  MyChoice began testing and selling its products and services to businesses for out-of-home use, including well-known chains like Dave & Busters.  While still relying on human operators to detect and switch away from unwanted commercials, MyChoice spearheaded the newly developing market of restaurants, bars, and other venues with desires to present unique, customized experiences to their patrons.

18.    In 2017, Mr. Theriault invented the next generation of technology—a groundbreaking set of innovations directed to the curation of video content allowing for highly individualized viewing experiences.  As with the '518 Patent, Mr. Theriault sought patent protection of his ideas early by filing U.S. Provisional Patent Application No. 62/523,661 (the "'661 Provisional) on June 22, 2017.  Mr. Theriault followed up on the '661 Provisional with U.S. Patent Application No. 16/013,999, which issued as the asserted '658 Patent on July 7, 2020.  Mr. Theriault assigned the '658 Patent to MyChoice, including without limitation, all rights to enforce and collect damages and remedies for infringement of the '658 Patent.

19.    The '658 Patent claims systems and methods wherein "[a] monitoring station detects undesirable content and selects substitute content based upon user preferences stored in a system database."  '658 Patent at Abstract.  Before the time of the '658 Patent, television content control systems had limited methods for viewers of video content to switch between undesirable portions of a program to a desirable portion of a separate program, then switch back to the original program when the undesirable portion had ended.  '658 Patent at 1:22-41.  For example, through prior art systems, viewers could record a video stream for later viewing and then skip undesirable content when viewing the recording.  '658 Patent at 1:25-29.  However, this method would result in the drawback of a time delay, and the viewer would be unable to watch the content in real-time. '658 Patent at 1:25-29.

20.     In other prior art systems, viewers might have manually switched between content sources during undesirable sections of certain programs.  '658 Patent at 1:29-32.  However, manual switching between media channels is an inefficient method, in part because viewers cannot determine when undesirable portions of content have ended without significant effort and rapid channel surfing.  '658 Patent at 1:32-36.  Therefore, the innovations of '658 Patent are directed to solving the need in the prior art for systems that could predict portions of a media program during which viewers might want to view alternative content, provide said alternative content, and return automatically to original content when appropriate.  '658 Patent at 1:37-41.

21.     Thus, the claims of the '658 Patent are each, as a whole, directed to improving the real-time detection of undesirable content and substitution of desirable content in a media stream. And rather than merely automating the replacement of undesirable content in a media stream, the '658 Patent revolutionizes video viewing experiences through concrete, tangible technological solutions achieved through its novel methods of content curation.

22.     As one example of the tangible benefits, solutions, and efficiencies that the '658 Patent provides to the art of media content curation, the asserted claims grant the ability to *customize* the content replacement method to a user's specific preferences.  This benefit is achieved through a number of specific improvements included in the '658 Patent claims.  First, the ability to detect undesirable content in real-time is a significant improvement not available in prior art systems.  *See, e.g.,* '658 Patent at 3:40-58; 6:55-64.

23.     Second, the '658 Patent provides for content substitution that accurately identifies relevant types of desirable substitute content.  The '658 Patent's claims further describe exactly how this can be done; for example, claim 1 includes the steps of:

> selecting substitute content, by the monitoring station, wherein the substitute content has a plurality of substitute content attributes, at least one of the

plurality of **substitute content attributes associated with the primary content attribute and the primary content attribute associated with a first user preference indicating desirability**, and at least one of the plurality of **substitute content attributes directly associated with a second user preference indicating desirability.**

'658 Patent at 8:5-13 (emphases added).  In other words, claim 1 selects substitute content by (1) associating attributes of substitute content with attributes of the primary content, (2) associating attributes of primary content to a first user preference indicating desirability, and (3) associating attributes of substitute content with a second user preference indicating desirability.

24.     Third, the '658 Patent claims specific improvements to prior art content replacement systems by claiming systems and methods that allow for a seamless return to primary media streams once undesirable portions of the primary stream have concluded.  This solves the problem in the prior art that manual switching between problem sources created—an inaccurate, unreliable return to the original media stream.  '658 Patent at 1:29-36.  The claims of the '658 Patent further explain how this benefit is achieved:

> responsive to detecting the end to the undesirable content in the first media stream, transmitting, from the monitoring station, a second trigger signal to the output device;
>
> further responsive to detecting the end to the undesirable content in the first media stream, changing, in the system database, the undesirable content attribute associated with the first media stream.

'658 Patent at 8:30-37.  Thus, the invention of the '658 Patent provides a specific mechanism for how the claimed invention allows for accurate and seamless switching back to primary content when undesirable portions have concluded.

25.     The claims of the '658 Patent further accomplish their goal of enabling a highly individualized viewing experience through a number of inventive elements that were not well-understood, routine, or conventional at the time of the patent.  For example, one of the most significant inventive elements of the '658 Patent is how substitute content can be selected and

substituted based on qualities or preferences as to content received in an initial media stream. Through association of content attributes between a primary media stream and substitute content, the '658 Patent allows for dynamic tailoring of the content substitution because the attributes of the primary media content may change over time, and would therefore select different substitute content depending on the current state of the primary media stream. '658 Patent 6:21-36.

26.    A second, specific inventive element of the '658 Patent is the ability to configure information regarding the content of media streams in a database, allowing for the claimed invention to build a catalogue of data to better improve the accuracy of content classification. For example, this inventive element is represented in the following elements of claim 1:

> further responsive to detecting in real-time the undesirable content in the first media stream, ***configuring, in the system database, an undesirable content attribute*** and associating the undesirable content attribute with the first media stream . . .

> further responsive to detecting the end to the undesirable content in the first media stream, ***changing, in the system database, the undesirable content attribute*** associated with the first media stream . . .

'658 Patent at 8:19-23; 8:34-37. Indeed, during examination, the United States Patent and Trademark Office found that this inventive feature was not demonstrated in the prior art. U.S. Pat. App. No. 16/013,999, <u>Notice of Allowance</u>, March 11, 2020 at 3 ("the combination of White, Des Jardins and Matz does not clearly demonstrate the newly added limitations upon detection of undesirable content in the first media stream, associating an undesirable content attribute with the first media stream and upon detection of the end of undesirable content changing the undesirable content attribute.").

27.    Thus, both individually and as a whole, the elements of the '658 Patent's claims were not well-understood, routine, or conventional at the time of the '658 Patent.

B.     **BarBoards' Next-Generation Product and Partnership With MyChoice**

28.     BarBoards was founded in Texas in 2023 with the mission of building a network of dynamic partnerships, ensuring that bars, restaurants, and other venues can thrive while enhancing the experience of their patrons and brand sponsors.  Through BarBoards' signature product, the BarBox, as well as other products and services, BarBoards brings elevated experiences to venue chains by allowing business owners to maximize their control of television screens as they see fit and providing advertisers with a channel to reach more relevant consumers.  BarBoards further empowers local businesses and non-profits to access local audiences in a community-focused environment.  BarBoards is dedicated to opening the door to an entirely new advertising market while providing unforgettable moments for customers.

29.     In November 2024, MyChoice and BarBoards began their partnership to develop and market the next generation of content curation products and services.  And in an exclusive license to the '658 Patent executed on January 13, 2025, MyChoice and BarBoards affirmed their commitment to advancing the future of content curation technology.

30.     Plaintiffs together own the entire right, title, and interest in the '658 Patent, including the right to seek damages for past and ongoing infringement.  Plaintiffs also own many other patents and patent applications that are not asserted in this case at this time.

31.     Plaintiffs have complied with the marking requirements of 35 U.S.C. § 287 at least because the '658 Patent is displayed publicly on BarBoards' website—https://www.barboards.tv.

C.     **Taiv's Awareness of Infringement and First Lawsuit**

32.     Taiv has actual knowledge of MyChoice's '658 Patent and its applicability to Taiv's products and methods.  For example, on or about June 17, 2022, Mr. Theriault sent a LinkedIn communication to Mr. Noah Palansky, Taiv's CEO, detailing MyChoice's technology,

attaching information regarding MyChoice's '658 Patent, and stating directly that Taiv was infringing MyChoice's patent.

33.     Unable to resolve the dispute without litigation, MyChoice filed a lawsuit ("Prior Litigation") in this District on November 2, 2023, asserting the '658 Patent against Taiv's first-generation commercial replacement system ("Original Taiv System").  Complaint, *MyChoice, LLC v. Taiv, Inc.*, No. 23-cv-00507-JRG-RSP (E.D. Tex. Nov. 2, 2023), ECF No. 1.

34.     The Original Taiv System comprises a proprietary system of hardware and software installed primarily at bars and restaurants.  This Original Taiv System, accused in the 507 Case, allows bar and restaurant employees to input preferences regarding the types of content to be displayed on the bar or restaurant's televisions.  The primary use case for the system is to use the Taiv system during a sports game broadcast, during which the Original Taiv System detects commercial breaks in the television broadcast and plays substitute content on the bar or restaurant's televisions, including third-party advertiser content.

**D.     Taiv's Partnership with Iris TV and the New Taiv System**

35.     Upon information and belief, Taiv entered into a partnership in or around September 2025 with Iris TV in which Iris TV's technology is integrated into Taiv's custom content replacement products and services (the "New Taiv System").

36.     The New Taiv System adds significant new infringing technology materially different from that in the Original Taiv System.  For example, Taiv's press release regarding the new Iris TV integration states: "**For the first time**, advertisers can target ads at the exact moments that matter during live professional and collegiate sporting events, including all NFL, NBA, NHL, MLB, and playoff games, in bars, restaurants, and venues nationwide."  https://blog.iris.tv/en/taiv-is-iris-enabled-unlocking-scene-level-live-sports-in-ctv-out-of-home (emphasis added).

37.    The New Taiv System allows advertiser employees to input highly specific user preferences as to the substitute content that is displayed in place of commercial breaks in the television broadcast, such as user preferences that a particular advertisement be played when the home team has the lead in a game, or when a particular event occurs in the game, such as a touchdown in football or a power play in hockey.



https://blog.iris.tv/en/taiv-is-iris-enabled-unlocking-scene-level-live-sports-in-ctv-out-of-home. Thus, the New Taiv System constitutes a new system beyond the Original Taiv System that infringes the '658 Patent through, for example, the New Taiv System's use of different content attributes and user preferences.

38.    In addition, social media posts from Taiv's executives, including posts from Founder and CEO of Taiv, Noah Palansky, confirm that the New Taiv System is an entirely new and different product offering from the Original Taiv System:



**Noah Palansky** ✓ · 3rd+
Founder & CEO at Taiv | YC W20
2w · Edited · 🌐

+ Follow    ···

🔥 Big news from Taiv: live sports advertising will never be the same.

For the first time, brands can buy ads programmatically based on the emotion of the game. This is real-time, context-driven, scene-level relevance at scale. And it is available today across every major sports league.

✨ Imagine this:
🥤 A "you need a drink" spot that only runs when the home team is losing
🎉 Your brand sponsoring the big plays and the moments fans celebrate forever
💊 Pain relief when a brutal penalty or injury has everyone wincing
🏦 Betting offers or financial promos during the nail-biting finishes
🎁 Dynamic giveaways if the home team pulls off the impossible
🌎 Local pride messages when the hometown team takes the field

Taiv ingests 50+ sports signals like score changes, red zone drives, penalties, close games and final minutes. We map them to emotional states and audience profiles so advertisers can buy dynamically. That means your budget only deploys when the right conditions are met and never wastes impressions when they are not.

This is not just running ads. It is sharing the highs, easing the lows, and becoming part of the story fans tell with their friends and family.

🚀 Live sports finally meets real-time contextual relevance at scale.

Check out the full announcement here: **https://lnkd.in/gDHMWUEy**

Big thanks to **IRIS.TV**, **Viant Technology**, and **Place Exchange** who partnered up with us to make this possible.

https://www.linkedin.com/posts/noahpalansky_big-news-from-taiv-live-sports-advertising-activity-7378505681106042880-g0CI.  As shown in the post above, Taiv touts that through its New Taiv System advertisers can, for the first time, "buy ads programmatically based on the emotion of the game.  This is real-time, context-driven, scene-level relevance at scale."  *Id.*  Taiv also highlights the new content attributes implemented in the New Taiv System—"50+ sports signals like score changes, red zone drives, penalties, close games and final minutes."  *Id.*  These

new content attributes map directly to the '658 Patent's disclosure of embodiments that include halftime and score differentials as content attributes. *See* '658 Patent at 6:55-60.

39.     As another example, Taiv co-founder Avi Stoller shared a social media post explaining that the New Taiv System allows advertisers to "connect with fans in real time with a level of precision that has never been possible before":



Some of the best ideas don't just come from clients. They come from the people on your team who spend every day listening to them.

This partnership with IRIS.TV started exactly that way. One of our team members saw a gap: advertisers kept asking how they could better capture the value of live sports in bars and restaurants. Instead of just talking about it, we decided to build it.

Now, Taiv is officially IRIS-enabled, unlocking scene-level live sports data in CTV out-of-home. That means advertisers can connect with fans in real time with a level of precision that has never been possible before.

https://www.linkedin.com/posts/avistoller_some-of-the-best-ideas-dont-just-come-from-activity-7378433037023375360--q1r.

40.     In addition, a blog post on Taiv's website dated September 24, 2025, announces that the New Taiv System offers the new functionality of "Taiv Sportsparting"—"a media strategy that enables advertisers to reach fans in real time, during specific games and matchups, across a nationwide network of TV screens in high-traffic venues like bars and restaurants." https://www.taiv.tv/blog/introducing-sportsparting-a-new-way-to-reach-sports-fans-in-real-time. Taiv's website further states that with the New Taiv System, Taiv can "turn public venue TVs into intelligent, media-enabled displays that recognize what's playing in real time and then automatically deliver relevant branded content during commercial breaks." *Id.* Taiv's website

further provides the following bulleted list of new features offered by the New Taiv System under the heading "How It Works":

- **Live Game Recognition**: Our tech identifies what's on screen in real-time and only shows ads in venues that meet targeting when they are also showing the game type you are targeting.

- **Real-Time Scheduling**: Brands can activate creative based on the actual sports games being shown on each TV, not just static time slots.

- **Dynamic Venue Targeting**: Reach fans nationally or locally, tailoring messages to specific teams, cities, or fan cultures.

- **Dynamic Creative Flexibility**: Run offers, CTAs, or timely brand messages dynamically triggered by what's happening in the game at the moment your ad plays.

*Id.*

41.     On its website, Iris TV explains that it analyzes content and categorizes content attributes like sentiment, context, and brand safety—all content attributes and functionality materially different from and not present in the original Taiv system.



iris.tv/our-platform/.

42.     The timing of Taiv's announcement of the New Taiv System is alarming. Upon information and belief, Taiv has actively copied the innovations claimed by the '658 Patent to

develop the New Taiv System without first obtaining a legal right to practice the claims of the '658 Patent. Indeed, as explained above, Taiv has had knowledge of the '658 Patent since as early as June 2022. Thus, upon information and belief, Taiv's infringement of the '658 Patent is intentional and willful.

## COUNT I

### Taiv's Infringement of U.S. Patent No. 10,708,658

43.     Plaintiffs repeat and reallege, as if fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

44.     Taiv directly infringed and continues to directly infringe, under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, at least claims 1-14 of the '658 Patent by manufacturing, using, selling, offering to sell, and/or importing into the United States the New Taiv System.

45.     Taiv has been and is indirectly infringing the '658 Patent by actively inducing or contributing to the infringement by others of the '658 Patent in the United States, the State of Texas, and this Judicial District.

46.     Taiv also has been and is now knowingly and intentionally inducing infringement of at least claims 1-14 of the '658 Patent in violation of 35 U.S.C. § 271(b). Taiv has had knowledge of the '658 Patent and the infringing nature of the New Taiv System since at least the filing and service of this Complaint, and in fact as early as June 17, 2022.

47.     Taiv specifically intended and was aware that the ordinary and customary use of the New Taiv System would infringe the '658 Patent.

48.     Taiv further took active steps to encourage end users to use and operate the New Taiv System, despite knowing of the '658 Patent, in a manner Taiv knew to directly infringe at least claims 1-14 of the '658 Patent. Further, Taiv has provided instruction materials, engineering

support, customer support, customer training, and other services that cause their Taiv Partners, advertiser customers, subscribers, and other third parties to use and operate the New Taiv System for their ordinary and customary use, such that Taiv's Taiv Partners, advertiser customers, subscribers, and other third parties have directly infringed the '658 Patent, through the normal and customary use of the New Taiv System.

49.    Taiv also has been and is now in violation of 35 U.S.C. § 271(c) by contributing to infringement of at least claims 1-14 of the '658 Patent, literally and/or under the doctrine of equivalents, by, among other things, selling, offering for sale, and/or importing within this Judicial District and elsewhere in the United States, the New Taiv System with knowledge of the '658 Patent and knowing that the New Taiv System is especially made or especially adapted for use in infringement of the '658 Patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

50.    Taiv's infringement (both direct and indirect) of the '658 Patent has been, and continues to be, with full knowledge of the '658 Patent, since at least as early as the filing of this Complaint, and in fact as early as June 17, 2022, when Taiv was provided written notice of the '658 Patent and its infringement thereof.  On information and belief, Taiv had actual knowledge of that patent or was at least willfully blind as to its existence and had actual knowledge or was at least willfully blind that its actions would cause its employees, agents, partners, customers, users, and/or suppliers to infringe that patent

51.    As set forth below, the New Taiv System meets every limitation of at least Claim 1 of the '658 Patent.

52.    For example, Claim 1 of the '658 Patent recites:

> A method of replacing undesirable content in a first media stream being received by an output device which transmits media to a display viewable by a user,

the first media stream containing primary content having a primary content attribute, the method comprising the steps of:

detecting in real-time, by a monitoring station, the undesirable content in the first media stream, wherein the undesirable content corresponds to a user preference indicating undesirability, the user preference indicating undesirability associated with the user and stored in a system database;

selecting substitute content, by the monitoring station, wherein the substitute content has a plurality of substitute content attributes, at least one of the plurality of substitute content attributes associated with the primary content attribute and the primary content attribute associated with a first user preference indicating desirability, and at least one of the plurality of substitute content attributes directly associated with a second user preference indicating desirability;

responsive to detecting in real-time the undesirable content in the first media stream, transmitting, from the monitoring station, a first trigger signal, and directing the output device to a second media stream containing the substitute content;

further responsive to detecting in real-time the undesirable content in the first media stream, configuring, in the system database, an undesirable content attribute and associating the undesirable content attribute with the first media stream;

wherein the output device switches from the first media stream to the second media stream in response to the first trigger signal;

after transmitting the first trigger signal, monitoring, by the monitoring station, the first media stream for an end to the undesirable content;

responsive to detecting the end to the undesirable content in the first media stream, transmitting, from the monitoring station, a second trigger signal to the output device;

further responsive to detecting the end to the undesirable content in the first media stream, changing, in the system database, the undesirable content attribute associated with the first media stream; and,

wherein the output device switches from the second media stream to the first media stream in response to the second trigger signal.

'658 Patent, 7:61-8:40.

53.    By way of example, the New Taiv System meets every element of Claim 1.[1]

---

[1] These allegations are provided solely for the purpose of satisfying the notice requirements of Rule 8(a)(2) of the Federal Rule of Civil Procedure.  No part of these allegations construe, or are

54.    To the extent the preamble is found limiting, the New Taiv System performs a method of replacing undesirable content in a first media stream being received by an output device which transmits media to a display viewable by a user, the first media stream containing primary content having a primary content attribute. *See, e.g.*:



https://www.taiv.tv/.



https://vimeo.com/1098613791?fl=pl&fe=ti (Taiv Partners Demo Video) at 0:05.

---

intended to construe, the claims, specification, or prosecution history of the '658 Patent.  These allegations do not represent Plaintiffs' preliminary or final infringement contentions, and Plaintiffs reserve the right to modify their infringement positions as discovery progresses in this case.  These allegations do not limit, and are not intended to limit, Plaintiffs' positions or contentions on claim construction, infringement, or validity.



https://vimeo.com/1098613791?fl=pl&fe=ti (Taiv Partners Demo Video) at 0:21.



https://www.taiv.tv/.



https://www.taiv.tv/ (annotated).



iris.tv/our-platform/.



iris.tv/our-platform/.

55.    As shown in the example below, the New Taiv System further comprises detecting in real-time, by a monitoring station, the undesirable content in the first media stream, wherein the undesirable content corresponds to a user preference indicating undesirability, the user preference indicating undesirability associated with the user and stored in a system database. *See, e.g.*:



https://www.taiv.tv/ (annotated).



https://vimeo.com/1098613791?fl=pl&fe=ti (Taiv Partners Demo Video) at 0:05.

9. Taiv will provide the Business software which will allow the Business to block specific industries or advertisers from playing in their business ("Blacklisting"). Blacklisting is provided on a best-effort basis and Taiv makes no guarantees or warranties regarding the accuracy of this functionality.

https://www.taiv.tv/btc.

56.     As shown in the example below, the New Taiv System further comprises selecting substitute content, by the monitoring station, wherein the substitute content has a plurality of substitute content attributes, at least one of the plurality of substitute content attributes associated with the primary content attribute and the primary content attribute associated with a first user preference indicating desirability, and at least one of the plurality of substitute content attributes directly associated with a second user preference indicating desirability.  *See, e.g.*:

**Why This Matters for Advertisers**

With TAIV now IRIS-enabled™, advertisers on **Viant DSP** can:

- **Target fans in real time**: Align creative with key game moments like touchdowns or power plays.
- **Reach premium audiences**: Engage 21+ viewers in high-attention environments across priority categories, including Alcohol, Gaming, QSR, Auto, and more.
- **Enter live sports affordably**: Access marquee leagues like the NFL or NBA without the multimillion-dollar broadcast minimums.
- **Conquest competition**: Maintain brand presence during high-profile events, even when broadcast rights are held by competitors.

**Looking Ahead**

IRIS-enabled™ scene-level targeting on TAIV gives advertisers a new way to connect with fans in culturally relevant moments. This partnership is about more than screens in bars. It unlocks true contextual targeting in live sports, at scale, in the places fans come together to watch.

Starting today, these capabilities are available exclusively in the Viant DSP, providing buyers with a powerful first-to-market advantage in real-time targeting in CTV OOH.

CTV and live sports are among the most powerful combinations in media. With TAIV becoming IRIS-enabled™, advertisers no longer need to choose between scale and precision. Now they can have both, engaging fans at the very moments that matter most.

https://blog.iris.tv/en/taiv-is-iris-enabled-unlocking-scene-level-live-sports-in-ctv-out-of-home (annotated).



**Noah Palansky** ✓ • 3rd+
Founder & CEO at Taiv | YC W20
2w • Edited • 🌐

**+ Follow**   ···

🔥 Big news from Taiv: live sports advertising will never be the same.

For the first time, brands can buy ads programmatically based on the emotion of the game. This is real-time, context-driven, scene-level relevance at scale. And it is available today across every major sports league.

✨ Imagine this:
🍺 A "you need a drink" spot that only runs when the home team is losing
🎉 Your brand sponsoring the big plays and the moments fans celebrate forever
🩹 Pain relief when a brutal penalty or injury has everyone wincing
🏦 Betting offers or financial promos during the nail-biting finishes
💰 Dynamic giveaways if the home team pulls off the impossible
🌐 Local pride messages when the hometown team takes the field

Taiv ingests 50+ sports signals like score changes, red zone drives, penalties, close games and final minutes. We map them to emotional states and audience profiles so advertisers can buy dynamically. That means your budget only deploys when the right conditions are met and never wastes impressions when they are not.

This is not just running ads. It is sharing the highs, easing the lows, and becoming part of the story fans tell with their friends and family.

🎯 Live sports finally meets real-time contextual relevance at scale.

Check out the full announcement here: https://lnkd.in/gDHMWUEy

Big thanks to IRIS.TV, Viant Technology, and Place Exchange who partnered up with us to make this possible.

https://www.linkedin.com/posts/noahpalansky_ctv-livesports-adtech-activity-7378505681106042880-Emtg?utm_source=share&utm_medium=member_desktop&rcm=ACoAACBTAQUBDcVLOjlglGzoi2lA__jRixmFnSo.

But now, for the first time, brands can take advantage of this untapped space with a new type of targeting: **Sportsparting**; a media strategy that enables advertisers to reach fans in real time, during specific games and matchups, across a nationwide network of TV screens in high-traffic venues like bars and restaurants.

While there are countless ways to reach an audience, **Sportsparting** delivers the content in context aligned with the in-person emotion of live sports by targeting:

- **Specific games** (e.g. Mets vs. Phillies on Friday night)
- **Specific leagues** (Thursday Night Football, Sunday Football, College Football Saturdays)
- **Specific teams** (regional targeting for die-hard fanbases)
- **Specific events** (UFC main cards, playoff rounds, championship fights)

With Taiv's proprietary platform, *Sportsparting* is now possible at scale. We turn public venue TVs into intelligent, media-enabled displays that recognize what's playing in real time and then automatically deliver relevant branded content during commercial breaks.

Passive screens become powerful media channels, connecting brands to fans when attention is high. 74*%* of viewers want more relevant messaging during live sports, and 80*%* say they tend to remember ads seen during live sports programming. (The Current)

https://www.taiv.tv/blog/introducing-sportsparting-a-new-way-to-reach-sports-fans-in-real-time (annotated).

**How It Works:**

- **Live Game Recognition:** Our tech identifies what's on screen in real-time and only shows ads in venues that meet targeting when they are also showing the game type you are targeting.
- **Real-Time Scheduling:** Brands can activate creative based on the actual sports games being shown on each TV, not just static time slots.
- **Dynamic Venue Targeting:** Reach fans nationally or locally, tailoring messages to specific teams, cities, or fan cultures.
- **Dynamic Creative Flexibility:** Run offers, CTAs, or timely brand messages dynamically triggered by what's happening in the game at the moment your ad plays.

https://www.taiv.tv/blog/introducing-sportsparting-a-new-way-to-reach-sports-fans-in-real-time/.



iris.tv/our-platform/.



iris.tv/our-platform/.



iris.tv/our-platform/.



https://www.iris.tv/use-cases/partners/ (annotated).

## Decoding the Encoded Segments

IRIS.TV will provide a decoding table for DSP partners to utilize to decode each encoded segment to understand the following information:

- **Encoded Segment:** IRIS.TV's encoded segment for each contextual value (available via the API response above)

- **Data Partner Segment Owner:** GumGum, Pixability Grapeshot etc

- **Segment Type:** IAB Category, Brand-safety, Brand-suitability, Logo, Brand, Emotion etc

- **Segment Key Value Pair:** Segment Code

- **Segment Name(s):** Name of segment with tiering (Tier 1-4)

- **Brand-safe Flag:** Whether the segment is brand-safe (Yes/No status)

- **Date Segment Created:** The date the segment was created

Decoding tables will be provided to each DSP partner upon the completion of all legal contracts.

https://support.iris.tv/iris_id-data-api-for-dsps.



https://info.iris.tv/hubfs/Sales%20Materials/IRIS-enabled%20Contextual%20Video/White%20Papers%20and%20Ebooks/The%20IRIS_ID.%20Making%20CTV%20More%20Transparent%20For%20Buyers%20And%20Sellers.pdf?hsLang=en-us.



https://info.iris.tv/hubfs/Platform/About%20IRIS.TV%20and%20the%20IRIS_ID.pdf?hsLang=en-us.

57.    As shown in the example below, the New Taiv System further comprises responsive to detecting in real-time the undesirable content in the first media stream, transmitting, from the monitoring station, a first trigger signal, and directing the output device to a second media stream containing the substitute content.  *See, e.g.*:



https://vimeo.com/1098613791?fl=pl&fe=ti (Taiv Partners Demo Video) at 0:05.

https://www.taiv.tv/blog/how-to-turn-sports-bar-tvs-into-your-1-marketing-tool (annotated).

**How It Works:**

- **Live Game Recognition:** Our tech identifies what's on screen in real-time and only shows ads in venues that meet targeting when they are also showing the game type you are targeting.

- **Real-Time Scheduling:** Brands can activate creative based on the actual sports games being shown on each TV, not just static time slots.

- **Dynamic Venue Targeting:** Reach fans nationally or locally, tailoring messages to specific teams, cities, or fan cultures.

- **Dynamic Creative Flexibility:** Run offers, CTAs, or timely brand messages dynamically triggered by what's happening in the game at the moment your ad plays.

https://www.taiv.tv/blog/introducing-sportsparting-a-new-way-to-reach-sports-fans-in-real-time (annotated).

58.    As shown in the example below, the New Taiv System comprises further responsive to detecting in real-time the undesirable content in the first media stream, configuring, in the system database, an undesirable content attribute and associating the undesirable content attribute with the first media stream. *See, e.g.*:



**More Sales**
Promote your drink specials and events on your existing TVs to increase revenue per guest.

**More Control**
Control what TV commercials play in your venue to block competitors and distasteful ads.

**Less Work**
Automate your TVs & digital signage. Remotely schedule everything.

https://www.taiv.tv/ (annotated).



https://vimeo.com/1098613791?fl=pl&fe=ti (Taiv Partners Demo Video) at 0:05.

9. Taiv will provide the Business software which will allow the Business to block specific industries or advertisers from playing in their business ("Blacklisting"). Blacklisting is provided on a best-effort basis and Taiv makes no guarantees or warranties regarding the accuracy of this functionality.

https://www.taiv.tv/btc.

59.    As shown in the example below, the New Taiv System further practices wherein the output device switches from the first media stream to the second media stream in response to the first trigger signal. *See, e.g.*:

## The Taiv Advantage

With **Taiv**, any restaurant can upgrade their sports bar experience, show their own promotions, and utilize the TVs like never before! Our AI algorithm automatically detects TV commercials in real time and switches to shows your own content. We integrate directly with existing AV systems to provide a seamless user experience, and it's completely **FREE** for the restaurant. Instead of showing commercials for competitors or toilet paper, you can showcase your own brand in the right place at the right time. Even better, we share a percentage of the ad revenue back with the restaurant creating a true win-win for everyone!

https://www.taiv.tv/blog/how-to-turn-sports-bar-tvs-into-your-1-marketing-tool (annotated).

**How It Works:**

- **Live Game Recognition:** Our tech identifies what's on screen in real-time and only shows ads in venues that meet targeting when they are also showing the game type you are targeting.

- **Real-Time Scheduling:** Brands can activate creative based on the actual sports games being shown on each TV, not just static time slots.

- **Dynamic Venue Targeting:** Reach fans nationally or locally, tailoring messages to specific teams, cities, or fan cultures.

- **Dynamic Creative Flexibility:** Run offers, CTAs, or timely brand messages dynamically triggered by what's happening in the game at the moment your ad plays.

https://www.taiv.tv/blog/introducing-sportsparting-a-new-way-to-reach-sports-fans-in-real-time (annotated).



https://vimeo.com/1098613791?fl=pl&fe=ti (Taiv Partners Demo Video) at 0:05.

But now, for the first time, brands can take advantage of this untapped space with a new type of targeting: **Sportsparting**; a media strategy that enables advertisers to reach fans in real time, during specific games and matchups, across a nationwide network of TV screens in high-traffic venues like bars and restaurants.

While there are countless ways to reach an audience, **Sportsparting** delivers the content in context aligned with the in-person emotion of live sports by targeting:

- 🏀 **Specific games** (e.g. Mets vs. Phillies on Friday night)
- 🏈 **Specific leagues** (Thursday Night Football, Sunday Football, College Football Saturdays)
- 🏀 **Specific teams** (regional targeting for die-hard fanbases)
- 🥊 **Specific events** (UFC main cards, playoff rounds, championship fights)

**With Taiv's proprietary platform, _Sportsparting_ is now possible** at scale. We turn public venue TVs into intelligent, media-enabled displays that recognize what's playing in real time and then automatically deliver relevant branded content during commercial breaks. Passive screens become powerful media channels, connecting brands to fans when attention is high. 74*%* of viewers want more relevant messaging during live sports, and 80*%* say they tend to remember ads seen during live sports programming. (The Current)

https://www.taiv.tv/blog/introducing-sportsparting-a-new-way-to-reach-sports-fans-in-real-time (annotated).

60.     As shown in the example below, the New Taiv System further comprises after transmitting the first trigger signal, monitoring, by the monitoring station, the first media stream for an end to the undesirable content.  *See, e.g.*:



https://vimeo.com/1098613791?fl=pl&fe=ti (at 0:19).



https://vimeo.com/1098613791?fl=pl&fe=ti (at 0:21).

61.    As shown in the example below, the New Taiv System further comprises responsive to detecting the end to the undesirable content in the first media stream, transmitting, from the monitoring station, a second trigger signal to the output device. *See, e.g.*:



https://vimeo.com/1098613791?fl=pl&fe=ti (at 0:21).

## The Taiv Advantage

With **Taiv**, any restaurant can upgrade their sports bar experience, show their own promotions, and utilize the TVs like never before! Our AI algorithm automatically detects TV commercials in real time and switches to shows your own content. We integrate directly with existing AV systems to provide a seamless user experience, and it's completely **FREE** for the restaurant. Instead of showing commercials for competitors or toilet paper, you can showcase your own brand in the right place at the right time. Even better, we share a percentage of the ad revenue back with the restaurant creating a true win-win for everyone!

https://www.taiv.tv/blog/how-to-turn-sports-bar-tvs-into-your-1-marketing-tool (annotated).

**How It Works:**

- **Live Game Recognition:** Our tech identifies what's on screen in real-time and only shows ads in venues that meet targeting when they are also showing the game type you are targeting.

- **Real-Time Scheduling:** Brands can activate creative based on the actual sports games being shown on each TV, not just static time slots.

- **Dynamic Venue Targeting:** Reach fans nationally or locally, tailoring messages to specific teams, cities, or fan cultures.

- **Dynamic Creative Flexibility:** Run offers, CTAs, or timely brand messages dynamically triggered by what's happening in the game at the moment your ad plays.

https://www.taiv.tv/blog/introducing-sportsparting-a-new-way-to-reach-sports-fans-in-real-time (annotated).

62.     As shown in the example below, the New Taiv System practices further responsive to detecting the end to the undesirable content in the first media stream, changing, in the system database, the undesirable content attribute associated with the first media stream. *See, e.g.*:



https://vimeo.com/1098613791?fl=pl&fe=ti (at 0:21).



https://www.taiv.tv/ (annotated).

> 9. Taiv will provide the Business software which will allow the Business to block specific industries or advertisers from playing in their business ("Blacklisting"). Blacklisting is provided on a best-effort basis and Taiv makes no guarantees or warranties regarding the accuracy of this functionality.

https://www.taiv.tv/btc.

63.    As shown in the example below, the New Taiv System further practices wherein the output device switches from the second media stream to the first media stream in response to the second trigger signal. *See, e.g.*:



https://vimeo.com/1098613791?fl=pl&fe=ti (at 0:19).



https://vimeo.com/1098613791?fl=pl&fe=ti (at 0:21).

64.    Plaintiffs have been and continue to be damaged by Taiv's infringement of the '658 Patent.

65.    On information and belief, since June 17, 2022, and by no later than the filing and service of this Complaint, Taiv has willfully infringed the '658 Patent.

66.    On information and belief, the conduct by Taiv in infringing the '658 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

67.    On information and belief, Taiv has had at least the following policies or practices that make its infringement of the '658 Patent willful and make this an exceptional case: (1) not substantively investigating or responding to written notices of patent infringement; (2) not conducting sufficient due diligence to determine whether the company, business, and its New Taiv System were infringing; and (3) continuing with infringing acts of promoting, selling, using, offering for sale, and selling its New Taiv System after receiving notice thereof.

68.    Plaintiffs have been damaged and irreparably harmed by Taiv's infringement of the '658 Patent, which will continue unless and until permanently enjoined.

## PRELIMINARY AND PERMANENT INJUNCTION

69.    Plaintiffs repeat and reallege, as is fully set forth herein, the allegations set forth in the foregoing paragraphs of this Complaint.

70.    Plaintiffs intend to seek expedited discovery and pursue a motion for preliminary injunction seeking at least the following immediate relief during the pendency of this action:

      (a)    Barring Defendant Taiv from competing with Plaintiffs;

      (b)    Providing for all additional restrictions necessary to protect Plaintiffs from the harm likely to result from Taiv's continued infringing conduct.

71.    Plaintiffs further seek a permanent injunction incorporating the relief sought above with respect to a preliminary injunction.

72.     Preliminary and permanent injunctive relief against Taiv is appropriate because, as Plaintiffs will demonstrate through separate motion and briefing:

(a)     Taiv's conduct has caused and will continue to cause irreparable injury to Plaintiffs, particularly where Taiv and Plaintiff BarBoards are direct competitors in the market.  BarBoards has already suffered lost market share, and will continue to lose market share as a direct result of Taiv's infringing conduct without injunctive relief;

(b)     Monetary damages will be inadequate to remedy the injury;

(c)     An injunction is warranted considering the balance of hardships between the parties; and

(d)     Issuing the injunction would not disserve the public interest.

*Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (citing *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## JURY DEMAND

73.     Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the Court enter judgment in Plaintiffs' favor and against Taiv as follows:

(a)     That Taiv has directly infringed, either literally or under the doctrine of equivalents, the '658 Patent in violation of 35 U.S.C. § 271(a);

(b)     That Taiv has induced and/or contributed to infringement and/or is inducing and/or contributing to infringement of the '658 Patent, either literally or under the doctrine of equivalents;

(c)     Awarding Plaintiffs their damages suffered as a result of Taiv's infringement, including, but not limited to, a reasonable royalty pursuant to 35 U.S.C. § 284, Plaintiffs' actual damages, enhanced damages, exemplary damages, costs, prejudgment and post judgment interest to be proven at trial;

(d)     Awarding Plaintiffs costs and expenses pursuant to 35 U.S.C. § 284 or as otherwise permitted by law;

(e)     Ordering a permanent injunction against all present and future infringing acts by Taiv or, in the alternative, an award of an ongoing royalty;

(f)     Finding that Taiv's infringement has been willful at least as of June 17, 2022, and awarding Plaintiffs appropriate enhances damages pursuant to 35 U.S.C. § 284;

(g)     Finding this case to be exceptional within the meaning of 35 U.S.C. § 285;

(h)     Awarding Plaintiffs their costs, attorneys' fees, expenses, and interest;

(i)     Granting Plaintiffs such other and further relief as the Court deems just and equitable.

Dated:  October 24, 2025

Respectfully submitted,

*/s/ M. Craig Tyler*
M. Craig Tyler
Texas State Bar No. 00794762
CTyler@perkinscoie.com
Andrew Kalamarides
Texas State Bar No. 24136939
AKalamarides@perkinscoie.com
Helena E.D. Burns
Texas State Bar No. 24143961
HBurns@perkinscoie.com
Riley W. Zoch
Texas State Bar No. 24140456
RZoch@perkinscoie.com
**PERKINS COIE LLP**
405 Colorado Street, Suite 1700
Austin, Texas 78701
Tel: (737) 256-6100

Matthew Lutz (to be admitted *pro hac vice*)
Arizona State Bar No. 038546
MLutz@perkinscoie.com
**PERKINS COIE LLP**
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Tel: (602)-351-8068

*Attorneys for Plaintiffs*
*MyChoice, LLC and BarBoards, LLC*